## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES<br>AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ZVI FEINER,<br>FNR HEALTHCARE, LLC, and<br>EREZ BAVER,<br><br>Defendants,<br><br>and<br><br>NETZACH INVESTMENTS LLC, and<br>CEDARBROOK MANAGEMENT, INC.,<br><br>Relief Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 19-cv-6269 |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission, alleges the following against Defendants Zvi Feiner ("Feiner"), FNR Healthcare, LLC ("FNR Healthcare"), Erez Baver ("Baver"), and Relief Defendants Netzach Investments LLC ("Netzach") and Cedarbrook Management, Inc. ("Cedarbrook"):

### Nature of the Action

1.      From at least 2014 to 2017, Defendants Feiner and Baver operated a fraudulent scheme involving the misappropriation of proceeds raised through the offer and sale of membership interests in limited liability companies ("LLCs") that would purchase, own, and sell

nursing homes and assisted living facilities. Feiner and Baver ran the scheme primarily through Feiner's company, Defendant FNR Healthcare, where Feiner was the Chief Executive Officer and President, and Baver held the position of Executive Vice President. Since 2014, Feiner and FNR Healthcare raised more than $10 million from at least 62 investors for purported investments in four LLCs: (1) FNR Mountain Crest, LLC ("Mountain Crest"); (2) FNR NVP, LLC ("NVP"); (3) FNR Rosewood, LLC ("Rosewood"); and (4) North Capital Group, LLC ("North Capital"). During this same period, Baver also raised funds and solicited investors for Mountain Crest and Rosewood.

2.      Feiner is an ordained Orthodox Jewish rabbi and was a well-regarded figure in the Orthodox Jewish community on Chicago's north side and near north suburbs. As such, he exploited those relationships by soliciting members of the Orthodox Jewish community to invest in his scheme. Baver also solicited investors from this community.

3.      The investment strategy promoted by Feiner and Baver involved creating LLCs that would pool together investor funds in exchange for membership interests in the LLCs. Since 2010, Feiner raised investor funds for approximately 20 LLCs, including the four LLCs—Mountain Crest, NVP, Rosewood, and North Capital—offered during 2014 through 2017. Baver began raising funds from investors for certain of these entities starting in 2014.

4.      Through the distribution of offering memoranda and/or in oral conversations, the Defendants told investors that their funds would be used to purchase specific nursing home or assisted living facilities and that they would earn high returns from the performance of those investment properties. The Defendants typically represented that the previous owners of the facilities had not maximized the revenue that the facilities could generate and that the Defendants

-2-

would improve the operations of the facilities to generate the high returns that they promised to investors.

5.  While the Defendants used some of the investor funds to purchase the facilities at issue, they frequently misappropriated investor funds upon receipt for various purposes, including to pay promised distributions to investors in other LLCs, to support other struggling facilities, to pay back loans taken out on other facilities, and for their own personal use. To accomplish this, the Defendants frequently transferred funds between the bank accounts of the numerous LLCs, including Mountain Crest, NVP, Rosewood, and North Capital. Frequent transfers were also made between FNR Healthcare and many of the investment LLCs.

6.  During the relevant period, Feiner received at least $3 million from the various LLCs involved in the scheme, including the four LLCs that raised money since 2014, for his personal use. Netzach, an entity controlled by Feiner and owned by his family, also received at least $6 million from FNR Healthcare and from certain investment LLCs. Baver and his company, relief defendant Cedarbrook, received more than $2.5 million combined from the various LLCs, including the four aforementioned LLCs, for their personal use.

7.  On at least three occasions since 2014, Feiner sold facilities owned by other LLCs, including FNR Vermilion, LLC ("Vermilion"), FNR Lakeview, LLC ("Lakeview") and FNR South Holland LLC ("South Holland"), without telling the investors, and misappropriated the sale proceeds to support his other projects, to pay money owed to other investors and lenders, and for personal use, rather than distributing a portion of the sales proceeds to investors as he had promised.

8.  To date, none of the investors in Mountain Crest, NVP, Rosewood, or North Capital has had their investment principal returned to them. FNR Healthcare and the

approximately twenty LLCs involved in the investment scheme have little or no remaining assets, except, in some cases, the debt-encumbered properties.

## Jurisdiction and Venue

9.     The Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u and 78aa]. Defendants have, directly or indirectly, made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the acts, practices and courses of business alleged in this Complaint.

10.     Venue is proper in this judicial district pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because many of the acts, transactions and courses of business constituting the violations alleged in this Complaint occurred within the jurisdiction of this district.

## Defendants and Relief Defendants

11.     **Zvi Feiner**, age 49, is a resident of Chicago, Illinois.  Feiner is the sole owner and managing member of FNR Healthcare and was the managing member of the various LLCs that owned the underlying facilities.

12.     **FNR Healthcare, LLC** is an Illinois limited liability company Feiner formed in 2007, with its principal place of business in Skokie, Illinois.  FNR Healthcare received investor funds, either directly from investors or through transfers from other related entities.

13.     **Erez Baver,** age 39, is a resident of Chicago, Illinois.  Starting in 2012 and throughout the relevant period, Baver served as the Executive Vice President of FNR Healthcare.

Baver was also the president and sole owner of Cedarbrook, and controlled its operations at all relevant times.

14. **Netzach Investments, LLC** was an Illinois limited liability company formed in 2013 with its principal place of business in Chicago, Illinois. Netzach ceased being in good standing in April 2019. Feiner was the manager of Netzach, and his children each have membership interests. Netzach was an investment entity created to hold assets for Feiner and his family. At times throughout the fraudulent scheme, Netzach received investor funds and distributions derived from the revenue of the various investment LLCs.

15. **Cedarbrook Management, Inc.** was an Illinois corporation formed in 2012 with its principal place of business in Lincolnwood, Illinois. Cedarbrook was involuntarily dissolved in February 2019. Cedarbrook was a property management company that managed commercial real estate properties and provided consulting services to some of the operating companies that FNR Healthcare contracted with to manage elder care facilities. At times throughout the fraudulent scheme, Cedarbrook received investor funds and distributions derived from the revenue of the various investment LLCs.

## Facts

### The Defendants' Background

16. In written materials, Feiner described FNR Healthcare as "a private equity group focused on quality healthcare assets throughout the United States." However, FNR Healthcare itself did not purchase or sell any facilities. Instead, Feiner set up a separate LLC for each of the approximately twenty facilities he purchased, and he sold membership interests in those LLCs as a way for investors to invest in a specific facility.

17.     Feiner was primarily responsible for soliciting investors and did so using his relationships throughout the Orthodox Jewish community in Chicago.  Once the Defendants had raised sufficient investor funds, they would acquire a property through the LLC created for that particular facility.

18.     After acquiring the facility, the Defendants would identify an operator who could carry on the daily operations of the nursing home or assisted living facility, and the investment LLC would execute a lease with the operator, which in most cases included an option for the operator to buy the property after a specified number of years.

19.     As Executive Vice President of FNR Healthcare, Baver was responsible for, among other duties, identifying potential facilities to purchase, negotiating the purchase of the facility, helping secure lender financing for the purchase, and identifying and negotiating a lease with an operating company to carry on the daily operations of the facility.

20.     Baver also solicited investors for two LLCs and frequently responded to investor inquiries about the status of their investments.  At times, Baver knowingly provided investors with false information that Feiner had instructed him to share with investors.

21.     Baver was also responsible for maintaining the accounting records for FNR Healthcare and performing monthly reconciliation between the company's general ledger and its bank statements.  He also frequently transferred funds among the various LLCs' accounts at Feiner's direction.  Accordingly, at all relevant times, Baver had access to the bank accounts for FNR Healthcare and most of the various LLCs that held investors funds.

22.     For certain of the elder care facilities, Baver also provided consulting services to the nursing home operators through his company, Cedarbrook.  These services included regular meetings with the operators to review operations and recommend strategies for increasing

revenue, reducing expenses, upgrading the physical facilities, and other recommendations to promote the financial success of the facility. Cedarbrook received management fees directly from the LLCs that received these consulting services. Cedarbrook paid its own employees with these fees.

**The Investment Scheme**

23. Since 2010, Feiner raised investor funds in the following LLCs: FNR Akron, LLC ("Akron"); FNR Buckeye, LLC; FNR Champaign, LLC; FNR Decatur, LLC ("Decatur"); FNR Farmington, LLC; Lakeview; FNR Morris, LLC; Mountain Crest; FNR Norridge, LLC; NVP; Rosewood; FNR SH Healthcare, LLC; South Holland; Vermilion; FNR Westlake, LLC ("Westlake"); FNR Winfield, LLC; FNR Woodview, LLC; FNR Worthington, LLC ("Worthington"); FR Beta LLC; FR Strongville, LLC; and North Capital. Beginning in 2014, Baver assisted Feiner with raising funds for certain of these entities.

24. From at least March 2014 through 2017, Feiner and FNR Healthcare raised more than $10 million from at least 62 investors through the sale of membership interests in: (1) Mountain Crest, (2) NVP, (3) Rosewood, and (4) North Capital. Baver also raised funds and solicited investors for Mountain Crest and Rosewood. During this period, Feiner and FNR Healthcare also obtained funds for their scheme through the liquidation of properties held by certain of the other LLCs listed above and through loans from businesses and individuals, including from investors in the LLCs.

25. The Defendants told investors that the LLCs would purchase nursing homes and assisted living facilities and generate high returns from the performance of those investment properties. Investors were misled to believe that their funds would be used entirely to purchase

the facilities.  The Defendants also promised to improve the operations of the facilities to generate higher revenues from which distributions would be paid.

26.     Since 2014, using information that Feiner provided him, Baver was responsible for drafting the offering memoranda for certain of the LLCs.  He submitted them to Feiner for his approval before distribution to investors.  Feiner drafted at least one offering memorandum on his own, and drafted other offering materials for some LLCs that had no offering memoranda. The Defendants knew that the offering memoranda contained false statements.  Feiner and Baver each distributed offering memoranda to investors.

27.     The offering memoranda identified the specific elder care facility to be purchased by the LLC, described the "business plan" and "deal structure," and provided financial projections including anticipated returns to investors from the lease income provided by the operator.  Feiner told investors that the rents received from the operators would provide the funds to pay quarterly distributions to the investors.

28.     The financial projections in certain of the offering memoranda showed that the entire equity raise from investors would be used to help fund the property purchase, with a mortgage covering the rest of the purchase price.

29.     Typically, the offering memorandum and the operating agreement for each LLC stated that investors would receive a "preferred" annual return before the managers (e.g., Feiner and/or Baver) received any profits or fees, after which the investors and the managers would share profits according to an agreed percentage.  Other offering documents similarly contained representations that investors would receive a "preferred" share of the profits.  For example, Mountain Crest and NVP investors were promised a 15% preferred annual return.  Investors

were also typically told that they would receive the majority of sales proceeds upon the sale of a facility, in addition to the return of their investment principal.

30.     The offering memoranda often stated that the investment was "low-risk," that it was anticipated that investors would receive a complete return of their investment within three to five years, and, for certain of the entities, the investors would receive an additional "windfall" return upon sale of the property.  For example, Mountain Crest investors were to receive at least a 20% additional return upon disposition, and NVP investors were to receive at least a 44% additional return upon disposition.

31.     The offering memoranda frequently touted substantial personal investments by Feiner and/or Baver in the LLCs, when in fact they either did not invest at all or invested far less than what was represented.

32.     In most instances, Feiner directed each investor to send their funds to the entity in which they were investing.  For NVP, however, Feiner instructed the investors to submit their funds to FNR Healthcare.

33.     Feiner, Baver, and FNR Healthcare misappropriated investor funds upon receipt through frequent transfers of funds between Mountain Crest, NVP, Rosewood, and North Capital and the various LLCs that had been created earlier.  They used these funds to pay promised distributions to earlier investors of other LLCs, to support other struggling facilities, pay personal loans or loans taken out on other facilities, and for their own personal use.

34.     Since 2014, Feiner received at least $3 million combined from all of the LLCs, including Mountain Crest, NVP, Rosewood, and North Capital, for his personal use.  Relief Defendant Netzach also received more than $6 million from FNR Healthcare and several investment LLCs, which it used for a variety of purposes including repayment of several loans.

This combined $9 million came from investors' contributions, distributions of revenue generated by the facilities, proceeds from the sale of facilities, and loans directly from the facilities or private loans collateralized by the facilities.

35.     From 2014 through 2018, Baver and his company, Relief Defendant Cedarbrook, received more than $2.5 million of investor funds and revenue from nearly all of the LLCs involved in the scheme.  Baver and Cedarbrook received these funds in the form of "closing fees" when facilities were bought or sold, "management fees," periodic distributions, and personal loans made to Baver that were never fully repaid.

### Specific Fraudulent Conduct

36.     The investment scheme spanned approximately 20 LLCs, with extensive commingling of assets, including the four LLCs described below.

### Mountain Crest

37.     Feiner incorporated Mountain Crest in Delaware on May 5, 2014.

38.     Baver drafted the Mountain Crest offering memorandum using information provided to him by Feiner.  Feiner approved the memorandum before he and Baver distributed it to investors.  The memorandum purported to be "presented by" FNR Healthcare.  Feiner and Baver used the offering memorandum to solicit investors and knew it contained false statements.

39.     The Mountain Crest offering memorandum stated that the investment was "low-risk," that there was an "[a]nticipated complete return of investment within 3-5 years," and that investors would receive an "[a]dditional 20%+ 'windfall' cash return upon disposition."  These statements were false and misleading because, by the time the Defendants began raising funds for the Mountain Crest offering, they were already enmeshed in their fraud scheme and intended

to use new investor funds to continue making distribution payments to earlier investors in other investment LLCs and to support failing facilities held by other investment LLCs.

40.     The offering memorandum also made the following representations:

    a.  the total equity required for the purchase of the nursing facilities was anticipated to be $4.775 million;

    b.  Feiner and Baver would invest a minimum of $500,000 of their own capital and retain a 50 percent interest in the LLC; and

    c.  all profits would be evenly divided between the investors and the managers, but the investors would receive quarterly distributions at an annual return rate of 15 percent before any profits were paid to the managers.

41.     From May to August 2014, Feiner, FNR Healthcare, and Baver raised approximately $4 million from sales of Mountain Crest memberships to 39 investors.

42.     Contrary to the financial projections in the offering memorandum that showed the entire $4.775 million equity raise would be used to help fund the facility purchase, Feiner used only $3.4 million of investor funds towards the purchase of Mountain Crest.

43.     Then over the following months, Feiner and Baver used the excess funds for a variety of purposes, including transferring $47,000 to Akron, $24,000 to an entity owned by Feiner and Baver, and $218,000 to Cedarbrook.

44.     Contrary to the representations in the offering memorandum, Feiner and Baver never invested any of their own money in Mountain Crest.

45.     Feiner and Baver ceased paying investor distributions after April 2016, and in May 2018, the lender foreclosed on the Mountain Crest facility.  Mountain Crest ceased being in

good standing in the State of Delaware as of June 2018.  None of the investors has had their investment principal returned.

## **NVP**

46.     Feiner incorporated NVP in Illinois on August 14, 2014.

47.     Feiner drafted the offering memorandum for NVP and, from August 2014 through February 2015, he distributed it to investors knowing that it contained false and misleading statements.

48.     The NVP offering memorandum stated that the investment was "low-risk," that there was an "[a]nticipated complete return of investment within 3-5 years," and that investors would receive an "[a]dditional 44%+ 'windfall' cash return upon disposition."  These statements were false and misleading because, by the time Feiner and FNR Healthcare began raising funds for the NVP offering, they were already enmeshed in their fraud scheme and intended to use new investor funds to continue making distribution payments to earlier investors in other investment LLCs and to support failing facilities held by other investment LLCs.

49.     The NVP offering memorandum also stated that the total anticipated equity raise for the purchase of the nursing facilities was $2.8 million, and the financial projections reflected that the entire amount raised would be used for the purchase of the facilities.  However, Feiner raised nearly $4 million by selling NVP memberships to 31 investors.

50.     The NVP offering memorandum falsely stated that the LLC would purchase two nursing homes.  However, the transaction actually involved the purchase of three nursing homes.  NVP investor funds were used to purchase all three nursing homes, but the investors were only given equity in the two facilities described in the offering memorandum.

51.     Also contrary to representations in the offering memorandum that Feiner would invest a minimum of $250,000 of his own capital, Feiner never invested any of his own money in NVP.

52.     The NVP offering memorandum also made false statements concerning the breadth and years of experience of the operating companies for the two facilities.  The two principals of the operating companies did not have "more than two decades of nursing home experience," and in fact, each one had less than ten years of experience.  And they did not own and operate "800+ SNF beds throughout the St. Louis, MO region," but rather a substantially lower number of beds.

53.     Investors were directed to send their funds to FNR Healthcare's bank account rather than to NVP's bank account.

54.     Rather than using all of the investor funds for a down payment on the NVP facilities, Feiner and Baver diverted at least $2 million of investor funds for, among other things, covering debt and expenses of other LLCs.

55.     Three days before the purchase of the NVP facilities, Feiner caused FNR Healthcare to obtain a short-term, high-interest-rate loan of $2 million from a third party to plug in the gap created by the misappropriation of investor funds.

56.     Feiner never returned the investors' principal.  In February 2019, NVP was involuntarily dissolved.

### Rosewood

57.     Feiner incorporated Rosewood in Delaware on April 16, 2013.  Rosewood consisted of a portfolio of nursing facilities.  Feiner acquired an interest in Rosewood and then

later raised money from investors for the acquisition of the facilities. Feiner and Baver used an offering memorandum to raise funds for Rosewood.

58.     Using information that Feiner provided him, Baver drafted the offering memorandum for Rosewood, and both he and Feiner distributed it to investors. The memorandum purported to be "presented by" FNR Healthcare. The memorandum offered an "opportunity to acquire both the real estate and operations" of a portfolio of skilled nursing facilities.

59.     The memorandum falsely stated that Rosewood was "consistently" and "currently" profitable, but in fact, at the time of the offering, the Defendants knew that Rosewood was operating at a loss. The memorandum also contained a misleading statement that there was an "opportunity" to "procure readily-available HUD [Department of Housing and Urban Development] financing," but in fact, the Defendants knew that Rosewood already had mortgages from HUD and had already defaulted on those mortgages.

60.     In 2016, Feiner and FNR Healthcare raised at least $2.5 million from the sale of LLC interests in Rosewood to at least four investors, including $1 million from an 86-year-old Holocaust survivor. Around this same time, Feiner and Rosewood's operator issued promissory notes in their individual capacities and raised an additional $3.25 million that was placed into Rosewood's bank account.

61.     Rosewood transferred most of the funds it received from the LLC investors and the promissory notes to FNR Healthcare, which used the money for a variety of purposes, including sending money to other LLCs, Feiner, Cedarbrook, and investors in other LLCs. Neither Feiner nor FNR Healthcare disclosed to investors that they had transferred their funds to other entities. Feiner and FNR Healthcare used little, if any, of the money they raised from

-14-

investors in 2016 to acquire or benefit the nursing facilities described in Rosewood's offering memorandum.

62.     In mid-2018, the nursing facilities held by Rosewood defaulted on their mortgage debt.  As a result, HUD took control over the facilities.  None of the investors has had their investment principal returned.

### North Capital

63.     Feiner incorporated North Capital on November 4, 2010.  North Capital owned a parcel of land in Lincolnwood, Illinois on which it intended to build a retail complex.

64.     In 2014, Feiner and FNR Healthcare raised $500,000 from two investors for investment in North Capital, including $250,000 from the same elderly Holocaust survivor that invested in Rosewood.  After receiving these funds, North Capital sent $100,000 to a company owned by Feiner's former business partner.  North Capital also transferred $100,000 to Netzach which, in the previous month, had sent Rosewood $140,000 that Netzach had obtained from Worthington.  Feiner and FNR Healthcare used little, if any, of the money they raised for North Capital to build a retail complex, and, accordingly, no retail complex or other facility was ever built.

65.     Neither of the investors in North Capital have had any of their investment principal returned.

### Misappropriation of Property Sale Proceeds

66.     On three occasions since 2015, Feiner sold elder care facilities owned by three other LLCs, Vermilion, Lakeview, and South Holland, without telling investors of these sales. Under the offering terms for each of these LLCs, Feiner was supposed to return investors' principal investments once these facilities were sold and split any profits from the sale with

them.  Instead, he misappropriated the sale proceeds to support his other projects, pay money

owed to other investors and lenders, and for personal use, rather than distributing the proceeds to

investors according to the terms of the offering materials for these LLCs.

67.     Feiner solicited investors for Vermilion starting in the summer of 2013.  Feiner

raised $1.75 million from ten investors.  Feiner told investors that when the facility was sold,

investors would receive back their investment principal plus a share of the sales proceeds.  Feiner

misled two people into believing they and Feiner were the only investors in Vermilion, when in

fact there were eight other investors.  Similarly, Feiner misled a separate group of six investors

into believing that group and Feiner were the only investors in Vermilion.  Feiner concealed the

true number of investors by providing these two separate groups of investors with different

versions of the Vermilion operating agreement for their signatures.  In late July 2013, Feiner

used a portion of these investor funds towards the purchase of the Vermilion facility.

68.     Nearly two years later, on May 1, 2015, Feiner caused Vermilion to sell the

facility for $2.58 million of net sale proceeds.  The same day, Feiner transferred $2.52 million of

the sales proceeds to FNR Healthcare and $61,400 of the sales proceeds to Cedarbrook.  From

FNR Healthcare, Feiner immediately transferred $400,000 to his own personal account,

$100,000 to an entity he controlled, Feiner Investment Corp., and another $35,500 to Netzach.

Feiner continued to misappropriate the sale proceeds that day, by paying a loan for another entity

and transferring $400,000 from FNR Healthcare to other investment LLCs, including NVP,

North Capital, and Decatur.

69.     Feiner concealed the sale from the Vermilion investors for eighteen months by

continuing to pay them distributions.  These distributions were funded by periodic transfers of

funds from FNR Healthcare, which misappropriated funds from other investors and other

investment LLCs for this purpose. The fake distribution payments continued until November 2016, at which point the Vermilion investors learned that the facility had been sold. Feiner neither gave investors their investment principal nor their additional share of the Vermilion sale proceeds that he had promised them when they invested.

70. Feiner raised $3.5 million from five investors for Lakeview in the fall of 2013. Feiner told investors that when the facility was sold, investors would receive back their investment principal plus an additional share of the sales proceeds. On September 4, 2015, Feiner sold the facility but did not reveal this fact to investors. FNR Healthcare received nearly $800,000 from the sale proceeds. Over the following five days, Feiner transferred a total of $257,000 to his personal bank account and Netzach. During the same time period, he transferred $285,000 to other investment LLCs, including Decatur, Akron, North Capital, and Westlake, and paid back loans.

71. To conceal the sale of Lakeview, Feiner continued paying distributions to investors through at least October 2016. Some investors continued receiving distributions until November 2016. All distributions made after the sale of the Lakeview facility in September 2015 were funded by periodic transfers of funds from FNR Healthcare, which misappropriated funds from other investors and other investment LLCs to make these distribution payments. Feiner neither gave investors their investment principal nor their additional share of the Lakeview sale proceeds that he had promised them they would receive when the facility was sold.

72. In the spring of 2013, Feiner raised nearly $3.7 million for South Holland from two investors. Feiner told investors that when the facility was sold, investors would receive back their investment principal plus an additional share of the sales proceeds. On September 30,

2016, Feiner caused South Holland to sell the nursing home it owned netting approximately $3.9 million after retiring the mortgage and paying other closing fees. At closing, Feiner directed $303,000 of the sales proceeds to an individual who had made a personal loan to Feiner. The remaining $3.6 million of sales proceeds was deposited in FNR Healthcare's bank account, and Feiner immediately began misappropriating the money. For example, on September 30, 2016, Feiner transferred $100,000 to his personal bank account, sent $200,000 to investors of other LLCs, and used $100,000 to make a loan payment. Less than a week later, FNR Healthcare sent $210,000 to Cedarbrook and $10,000 to Netzach. Feiner continued misappropriating the sales proceeds over the following months for various purposes, including transferring more than $600,000 to other investment LLCs, transferring additional funds to his personal bank account, and making payments to other investors and lenders. Feiner neither gave investors their investment principal nor their additional share of the South Holland sale proceeds that he had promised them they would receive when the facility was sold.

### The Collapse of the Scheme

73.    From 2012 through late 2015, the LLCs' investments appeared to investors to be performing well because investors were receiving periodic distributions. But in reality, as early as 2013, the facilities ran deficits and the various LLCs, including Mountain Crest, Rosewood, NVP, and North Capital, could not make the promised quarterly distributions out of the cash flow the facilities actually generated.

74.    Rather than tell investors the truth about the financial condition of the investment LLCs, Feiner and Baver made up the shortfalls in a number of ways, including the following:

a.  They commingled funds and freely transferred money between the various
    LLCs and in and out of FNR Healthcare's bank account to meet the most
    immediate needs across their projects;

b.  They paid distributions to investors using money that was raised from other
    investors purportedly to purchase facilities for new investment LLCs;

c.  With respect to at least three LLCs, Feiner sold facilities without telling
    investors and used the sale proceeds to support other facilities, pay
    distributions to investors in other LLCs, pay back loans, and pay himself,
    rather than return investors' principal; and

d.  Feiner also borrowed millions of dollars from investors and private lenders, in
    some cases using the elder care facilities as collateral, and used the loan
    proceeds to pay investors and keep up the appearance of a successful
    investment program; he then used new investor money to pay back these
    loans.

75.     By late 2015, the investment LLCs fell behind in paying investors their
distributions, and by late 2016, they had stopped paying nearly all distributions.  Feiner
prioritized paying certain investors over others, as some continued to receive distributions long
after others stopped receiving them.

76.     When investors questioned Feiner and Baver about why the payments were
arriving late or had stopped completely, Feiner and Baver provided various excuses, including
that the nursing home operator was mismanaging the given facility or that unspecified problems
with a bank prevented them from paying distributions.

77. In late 2015, two of the earliest investors began asking Feiner about the status of an LLC in which they had invested before 2014. Feiner told them that he was trying to sell the facility held by the LLC. Every few months, Feiner would reassure them that he would complete the sale of the facility.

78. In February 2017, the two investors hired an attorney to check public records and discovered that Feiner had sold the facility in 2015, but had not told any of the investors about the sale or distributed the sales proceeds to any investors.

79. Shortly thereafter, the investors confronted Feiner and he admitted on a telephone call that he had sold three elder care facilities in 2015 to pay off creditors and investors and kept some of the proceeds for his personal use. At this point, Feiner agreed to resign as manager of all of the LLCs that raised funds from investors.

## **Claims for Relief**

### **Count I**

#### *Violations of Section 10(b) of the Exchange Act and*
#### *Rule 10b-5 Thereunder (Against Feiner and FNR Healthcare)*

80. The Commission realleges and incorporate by reference paragraphs 1 through 79 as if fully set forth herein.

81. Defendants Feiner and FNR Healthcare, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly: (a) used or employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon other persons, including current and prospective investors.

82.     Feiner and FNR Healthcare acted with scienter by knowingly or recklessly engaging in the fraudulent conduct described above.

83.     By engaging in the conduct described above, Feiner and FNR Healthcare violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## Count II

### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder (Against Baver)

84.     The Commission realleges and incorporate by reference paragraphs 1 through 79 as if fully set forth herein.

85.     Defendant Baver, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly: used or employed devices, schemes, or artifices to defraud and engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon other persons, including current and prospective investors.

86.     Baver acted with scienter by knowingly or recklessly engaging in the fraudulent conduct described above.

87.     By engaging in the conduct described above, Baver violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## Count III

### *Violations of Section 17(a) of the Securities Act*
### *(Against All Defendants)*

88. The Commission realleges and incorporates by reference paragraphs 1 through 79 as if fully set forth herein.

89. By engaging in the conduct described above, Defendants Feiner, Baver, and FNR Healthcare, in the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, (i) employed devices, schemes or artifices to defraud; (ii) obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

90. Feiner, Baver, and FNR Healthcare acted with scienter by knowingly or recklessly engaging in the fraudulent conduct described above.

91. By engaging in the conduct described above, Feiner, Baver, and FNR Healthcare violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## Count IV

### *(Against Defendant Baver for aiding and abetting FNR Healthcare's and Feiner's violations*
### *of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder)*

92. The Commission realleges and incorporates by reference paragraphs 1 through 79 as if fully set forth herein.

93.     Defendant Baver knowingly or recklessly provided substantial assistance to FNR Healthcare and Feiner in their violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

94.     Under Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] Baver is liable for aiding and abetting FNR Healthcare's and Feiner's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

**Count V**

***(Against Relief Defendant Netzach Investments LLC)***

95.     The Commission realleges and incorporates by reference paragraphs 1 through 79 as if fully set forth herein.

96.     Relief Defendant Netzach received funds that were improperly obtained from investors and commingled with other funds.

97.     Netzach benefited from the fraud by obtaining funds belonging to investors.

98.     The monies received by Netzach, as alleged above, constituted ill-gotten gains from the fraud of others.

99.     Netzach has no legitimate claim to the ill-gotten gains it received as a result of the fraud of others or to any assets that were acquired with those ill-gotten funds.

**Count VI**

***(Against Relief Defendant Cedarbrook)***

100.    The Commission realleges and incorporates by reference paragraphs 1 through 79 as if fully set forth herein.

101.    Relief Defendant Cedarbrook received funds that were improperly obtained from investors and commingled with other funds.

102.    Cedarbrook benefited from the fraud by obtaining funds belonging to investors.

103.    The monies received by Cedarbrook, as alleged above, constituted ill-gotten gains from the fraud of others.

104.    Cedarbrook has no legitimate claim to the ill-gotten gains it received as a result of the fraud of others or to any assets that were acquired with those ill-gotten funds.

### Relief Requested

THEREFORE, the Commission respectfully requests that the Court:

### I.

Permanently enjoin Defendants Feiner, Baver, and FNR Healthcare, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### II.

Order Defendants Feiner and FNR Healthcare, jointly and severally, to disgorge the ill-gotten gains that they received from the violations alleged herein, including prejudgment interest thereon.  And order Defendant Feiner and Relief Defendant Netzach, jointly and severally, to disgorge the ill-gotten gains that Netzach received from the violations alleged herein, including prejudgment interest thereon.

### III.

Order Defendant Baver to disgorge the ill-gotten gains that he received from the violations alleged herein, including prejudgment interest thereon.  And order Defendant Baver and Relief Defendant Cedarbrook, jointly and severally, to disgorge the ill-gotten gains that Cedarbrook received from the violations alleged herein, including prejudgment interest thereon.

**IV.**

Order Defendants Feiner, Baver, and FNR Healthcare to pay civil penalties pursuant to Section 21 of the Exchange Act [15 U.S.C. § 78u] and Section 20 of the Securities Act [15 U.S.C. § 77t].

**V.**

Retain jurisdiction over this action to enforce the terms of all orders and decrees that this Court may enter.

**VI.**

Grant such other relief as the Court deems appropriate.

**Jury Demand**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Commission hereby requests a trial by jury.

Dated: September 19, 2019                    Respectfully submitted,


                                             /s/ Michael D. Foster
                                             Michael D. Foster (fostermi@sec.gov)
                                             Eric M. Phillips (phillipse@sec.gov)
                                             Jerrold H. Kohn (kohnj@sec.gov)
                                             Michelle Muñoz Durk (munozdurkm@sec.gov)
                                             U.S. Securities and Exchange Commission
                                             175 W. Jackson Blvd., Suite 1450
                                             Chicago, Illinois 60604-2615
                                             Phone: (312) 353-7390
                                             Fax: (312) 353-7398

                                             *Attorneys for Plaintiff*
                                             *U.S. Securities and Exchange Commission*